UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

EXPERIAN INFORMATION SOLUTIONS, INC.,

    Petitioner,

v.

YENON ARGY

    Respondent.

_____/

Case No.: 24-cv-60252-AHS

## DECLARATION OF YENON ARGY

Yenon Argy does hereby declare pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in connection with the Order in the above styled matter compelling compliance with Experian Information Solutions, Inc.'s Non-Party Subpoena directed to me.

2. I am over the age of 21, am a resident of the state of Florida, and I am competent to testify to those facts if called as a witness. I have not gone to law school, I am not a lawyer, and have never been licensed to practice law in any state.

3. I have been in the credit repair business for approximately 24 years. During this time I have advised thousands of individuals concerning matters related to credit repair. Since approximately 2010 I have been affiliated with Collective Credit International, LLC and do credit repair work for clients through this entity.

4. In order to perform credit repair work, I will first analyze the 3-bureau credit report for an individual. Upon reviewing the report, I will typically find one or more delinquent accounts. When I see a delinquent account, I will speak with the client about what occurred to

determine if there has been a credit reporting violation by one or more of the credit reporting bureaus as well as the entity who reported the delinquency.

5. If there is an issue with the credit reporting I will write a letter on behalf of the client to one or more of the three credit bureaus in an effort to have the improperly reported delinquency removed.

6. I have obtained clients over the years through a number of mechanisms. One such method is obtaining clients through referral sources. One such referral source is Efraim Fishel Friedman.

7. When a referral source such as Efraim Fishel Friedman sends me a credit repair matter, that referral source has typically signed up the client and collected a fee for credit repair services. From there, the referral source will pay me a flat fee to perform the credit repair work.

**Justin Zeig and Judah Stein**

8. I met a Florida based attorney named Justin Zeig in early 2018. He was introduced to me by his father who I have known for some time. According to Justin Zeig's father, his son was an attorney and he believed that we could benefit from knowing each other.

9. After speaking with Justin, we determined that I could refer credit repair cases where the defect was not removed and he would litigate the matter. In addition, he told me that he would introduce me to someone by the name of Judah Stein who was then with a lawfirm by the name of RC Law. According to Zeig, although Zeig could only file cases in Florida, Judah Stein had the ability to file cases nationally, and in particular, in New York and New Jersey.

10. Shortly after meeting Justin Zeig he introduced me to Judah Stein in the spring of 2018.

11. I learned through Justin Zeig and Judah Stein that it could be very lucrative to

refer them cases for litigation. Prior to meeting Justin Zeig and Judah Stein a very small portion of my credit repair business involved litigation. Although I am not certain of an exact number, I believe that it constituted less than 5% of the work that I did.

12. Both Justin Zeig and Judah Stein told me that I could help them by "setting up" a case for litigation. What this means is to position a file so that an attorney can bring a lawsuit against the three credit reporting bureaus as well as the entity that reported a delinquency to the client's credit.

13. Stein and Zeig advised me that this is very lucrative because the credit reporting agencies as well as the entity that reported the delinquency will often pay a "nuisance value" settlement for the case without a lot of effort. Given that there are often four defendants in these lawsuits, the amount of money adds up very quickly especially when the cases are filed in high volume.

14. It was agreed upon by myself, Judah Stein, and Justin Zeig that I would refer cases directly to Judah Stein and I would be paid a commission through Justin Zeig. For each settlement of a case that I sent to Judah Stein, I would receive 20% of the net proceeds of the lawsuit. The way that the money would flow would be that Judah Stein would keep 60% of the net proceeds of a case and he would send 40% of the net proceeds to Justin Zeig. Justin Zeig would then send me half of the 40% that he received (20% of the overall net settlement).

15. Justin Zeig would pay me by check and would typically put the case name – including the settling defendant – in the memo section of the check. An example of some of the settlement checks provided by Justin Zeig are attached hereto as composite Exhibit "A".

16. Shortly after meeting Judah Stein I was introduced to Yaakov Saks who is now law partners with Judah Stein.

**The Process of Sending Cases to Judah Stein and Yaakov Saks**

17. Judah Stein, Yaakov Saks, and their lawfirm Stein Saks would take a very hands off approach to lawsuits which they filed. For instance, they would typically not communicate with a client until long after a lawsuit was filed and usually not until one of the defendants requested the deposition of the plaintiff. Although there are exceptions, for the majority of the cases that I sent to Stein Saks, they did not have any contact information for the client until a deposition of the client was requested. At this time someone at Stein Saks would reach out to me to obtain the contact information for the client.

18. My role was building a file that the lawfirm of Stein Saks would then use to initiate a lawsuit against the credit bureaus and the entity that reported the delinquency. I was even in charge of having the client sign a Stein Saks retainer. An example of a completed package that I would typically send to Stein Saks is attached hereto as Exhibit "B".

19. As part of the package that I would send to Stein Saks I would include correspondence showing that a client had applied for credit but was denied. This was done at the direction of Judah Stein. According to Judah Stein, having a credit denial was necessary in order to establish that there were "damages" to the client which was needed to obtain money from the credit bureaus.

20. Until around January, 2023 this aspect of the lawsuit was achieved through obtaining a credit denial from Capital One. According to Judah Stein, Capital One Venture X "denies everyone" and I should have a client seek credit through the Capital One Venture X, be automatically denied, and send that denial as part of the package to his office.

21. However, in January, 2023 I was told on a telephone call with Judah Stein that the law changed and that a mortgage denial would now be necessary to prove the element of

damages.  Judah Stein told me that he would send me the language to use as a template for the letter.  Later that day I received two emails from Judah Stein with language to include in the mortgage denial letters.  The emails are attached hereto as Exhibit "C".

22. After this I began to create the letters on Cornerstone letterhead for Judah so that he could prove the element of damages.  This was done at the direction of Judah Stein.  A list of all of the customers and related cases that I created a Cornerstone letter for are attached here as Exhibit "D".  The only mortgage company that I wrote letters for was Cornerstone.

23. In addition to Judah Stein and Yaakov Saks I would communicate with Tamir Saland and Eliyahu Badah from the Stein Saks lawfirm.  Typically the communications related to initiation of a case or someone from Stein Saks asking for information about a particular client as they would rarely if ever communicate with a client that I sent to them.

24. Until December, 2023 the only way that I would communicate with the Stein Saks lawfirm or any of its attorneys was by email.  However, I began to communicate with Judah Stein through text message and WhatsApp in December, 2023 after Judah Stein called me from his cell phone.  Judah Stein's cell phone number is 917-913-7997.

**Sheindle Sofer**

25. One credit repair client that was referred to me by Efraim Fishel Friedman was Sheindle Sofer.

26. Friedman reached out to me in February, 2023 about this customer in need of credit repair.  I agreed to take on this client and Friedman paid me $550 to perform credit repair work on behalf of Ms. Sofer.

27. I did not communicate directly with Ms. Sofer, and instead, communicated with either Friedman or Friedman and Ms. Sofer's husband – Burach Sofer.  The only times that I

spoke with Mr. Sofer on the phone he was placed on the phone by Friedman.

28. I do not recall communicating with either Mr. or Mrs. Sofer – other than obtaining a retainer agreement through DocuSign, by email.

29. On behalf of Ms. Sofer I prepared dispute letters which were transmitted to the 3 credit reporting bureaus as well as Synchrony/Gap on or about March 28, 2023.

30. When none of the defects were removed from the credit report after the time that the bureaus are permitted to do so, on behalf of Stein Saks, I had Ms. Sofer sign a retainer agreement through DocuSign. A copy of the signed DocuSign retainer agreement and receipt are attached hereto as Exhibit "E". Upon receiving back the retainer agreement, I sent the retainer agreement and other documents that Stein Saks requested that I provide in order to initiate a lawsuit on May 16, 2023. See Exhibit "B".

31. As with the other 100+ cases that I sent to Stein Saks, I anticipated receiving a 20% referral fee of any net proceeds of the Sofer matter for referring this dispute to their office.

32. After sending the information to Stein Saks I had limited communications about the credit dispute with either Friedman or Mr. Sofer. I do not recall the exact date, but I believe that the last communication by phone about the matter with either of them was during the summer of 2023.

33. In November, 2023 I provided the lawfirm Stein Saks with Ms. Sofer's contact information as one of the defendants in the action had requested her deposition. According to my records, I had not provided them with the contact information for Ms. Sofer, or for that matter Mr. Sofer or Friedman, prior to that time.

34. Although I am routinely asked to assist with obtaining discovery responses from a client, I was never asked by Stein Saks to assist with discovery in the Sofer matter.

Case No.: 24-cv-60252-AHS

35. After providing Stein Saks with Sofer's contact information, the lawfirm reached out to me in January, 2024 in order to have Ms. Sofer sign a settlement agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 9, 2024.

Yenon Argy